113 So.2d 795 (1959)
Charles J. PUISSEGUR, Plaintiff-Appellant,
v.
Hennis LOUQUE & Zurich General Accident & Liability Ins. Co., Ltd., Defendants-Appellees.
No. 4844.
Court of Appeal of Louisiana, First Circuit.
June 30, 1959.
Jones, Walker, Waechter, Poitevent, Carrere & Denegre, John V. Baus, New Orleans, for appellant.
Normann & Normann, New Orleans, for appellee.
*796 ELLIS, Judge.
Plaintiff has appealed from a judgment of the district court for the Parish of Ascension, State of Louisiana, which dismissed his suit for damages for personal injuries, property damage, and medical expenses, as the result of his car having been struck from and in the rear by the car of the defendant Louque, while the former was parked admittedly without lights on the New Orleans-Baton Rouge Highway, U. S. 61, on the 9th of November, 1953.
Plaintiff has charged the defendant, Louque, with the following negligence which he alleged as the sole proximate cause of the accident, to-wit:
(a) In driving at a fast and reckless rate of speed on a dark, drizzly night;
(b) In failing to have his car under control;
(c) In failing to see petitioner and his automobile;
(d) In failing to be able to stop his automobile within the range of his headlights.
On November 9, 1953 plaintiff was returning from Alexandria via Baton Rouge, Louisiana, on his way to his home in New Orleans. When he arrived at Baton Rouge he stopped and had "supper" and when he left it had become dark and on that night it was rainy and drizzly. His car was a very old Dodge.[1] When he had gotten into the vicinity of Gonzales, La., all the lights on the car went out. Plaintiff readily admitted that he carried extra fuses in the glove compartment of his car. Evidently the lights on this old 1941 Dodge had gone out before as a result of a burned fuse. According to the plaintiff's own testimony, after the lights went out, being very familiar with the highway at this point as he had assisted as an engineer in its construction in 1927 and 1948, and stating that it was then under construction, he did not immediately attempt to drive his car to the right on the shoulder. Plaintiff then got a three cell flashlight which he carried in his car, got out and after assuring himself "that he could get further off on the shoulder of the road * * *" he got back in the car and that is when he noticed the defendant approaching from his rear. He testified that he then "pulled off as far as I could * * *". He stated that he pulled the entire front end of the car off onto the shoulder of the highway such a distance that the right rear wheel was also off the edge of the pavement which left approximately one-fourth of the car protruding in the highway. Plaintiff then states that he remained in the car under the wheel but somehow put the flashlight out of the left hand window and was holding it in his right hand and waving it, hoping that the defendant would see it and stop. Plaintiff also saw a car approaching from the opposite direction which later turned out to belong to the witness Downs. When the defendant struck the rear end of the unlighted parked automobile the plaintiff was still in it.
The defendant's version is that he was traveling on the Airline Highway toward New Orleans with his lights on low as contrasted to bright, because, due to the inclement weather one could see better with the low lights. He was corroborated in this statement by Downs, the other eye witness to the crash who also had his lights on dim or low for the same reason. He saw the Downs car, in fact, Downs also testified he saw defendant's car for several miles as they were approaching each other. Defendant stated that his lights were in good condition, although he did testify that he could only see with his lights 25 or 30 feet, which will be discussed hereinafter. He was proceeding at 40 to 50 miles per hour, which was also the speed that the plaintiff had been proceeding on the highway prior to his lights going out and which was the speed of the Downs car as it approached *797 from the opposite direction. He saw no tail lights of any automobile in front of him nor did he see the parked automobile until practically at the moment of impact, however, when he got right on the parked automobile he saw a flash of the flashlight which the plaintiff testified he had been flashing. Defendant only saw it one time when he estimated he was within 50 to 60 feet of the parked vehicle and in describing it said when he was "right on" it. He immediately applied his brakes hard but was unable to avoid striking the rear end of plaintiff's parked automobile.
The only other eye witness was Downs who was on his way to Slidell, La., via the Baton Rouge Airline Highway and was traveling in a southerly direction approaching plaintiff's car and that of the defendant. He testified that the weather was inclement and he had his lights on low rather than bright but that he could see the defendant's car approaching him for several miles. There was no question but that the lights on the defendant's car were visible to traffic for as far as the eye could see. Downs stated that when he was within approximately 150 feet of the parked automobile he sensed that something was on the highway but by the time he discovered that it was a car parked in the opposite lane he was passing it, and the defendant struck it at the same time. He never saw any lights come from the plaintiff's automobile and was most apprehensive as he knew he would arrive at the object at the same time as the approaching car, which he did and, as he stated, he almost thought he was in the collision because it occurred as he got opposite the plaintiff's parked car. It is Downs' positive testimony that the plaintiff's car was parked squarely in the center of the opposite lane and was not partly off of the pavement. We do not think this would make any material difference. If plaintiff's testimony were correct, it would be virtually impossible for the defendant to have seen the flashlight as his car would have been sitting at an angle with the front end pointed away from the highway to the right and it would have been necessary for plaintiff's right arm to have extended across his body and out of the left hand window a sufficient distance for the flashlight to have cleared the rear end of the car so that the approaching defendant could have seen the light. Even if the car was parked squarely in the center of the lane with no lights, it is strange that the plaintiff would sit in the car and attempt to reach across his body with his right hand to signal with the flashlight when he testified he had been out of the car with this fine three cell flashlight and could easily have signalled and stopped the defendant. Another discrepancy in the plaintiff's testimony is that he drove as far off on the shoulder as he could for the testimony shows that this shoulder was hard, safe and was at least 25 feet in width at the point that he parked his car on the pavement. One is lead to seriously doubt his story that he got out and looked to see where he could have parked with his flashlight, else he would have certainly run this car off of the highway. The defendant was of the impression, the only time he saw the flashlight was once and at that time the person holding it was outside of the car, which was immediately prior to or when the defendant was within fifty feet or sixty feet of the parked automobile. Downs testified that the plaintiff told him that when he saw the car coming that he got out and jumped in the back seat as he knew the collision was imminent in order to protect himself. It could be that he never flashed the light at all, never got out of the car until the defendant's automobile was getting close and he thought of jumping in the back to protect himself, and it was then that the defendant might have seen the flashlight. Of course, this brings up the thought as to why he would get out of a car which he knew was going to be struck and get back in it rather than to completely get out of the way. We cannot answer. There is no doubt that he was in the car at the moment of the crash. From reading the testimony we doubt that he did any *798 signalling and, if so, it was most ineffective from the description given by the plaintiff.
Plaintiff first charges the defendant with driving at a fast and reckless rate of speed on a dark, drizzly night. It was a dark, drizzly night but the testimony shows that all three automobiles, plaintiff's, Downs', and the defendant's were all driving about the same speed that night, which was not reckless or fast under the cirstances on this large main, paved highway.
Plaintiff next charges defendant with failing to have his car under control in that he could not stop his car within the range of his headlights. Counsel argues that defendant testified that he could see only 25 or 30 feet with his lights. Defendant was either in error in the estimate of the range of his lights or his range of vision. The testimony shows that the lights on the car were in good condition and it was a 1952 model Studebaker and the plaintiff testified that he could see the lights for several miles, and Downs could see the lights for several miles so there couldn't have been anything really wrong with defendant's lights. In addition we believe under the facts of this case that if his lights had been shining two or three hundred feet as the law directs this accident would have occurred, as defendant was not expected to anticipate a parked, unlighted automobile in his lane of travel. Motorists ordinarily do not see automobiles traveling in front of them by the power of their own lights but by the red tail lights on the forward car. It is an entirely different situation where a forward automobile without tail lights is moving, for in that instance the following car gradually overtakes the forward car and can see it, but when it is parked without any lights whatsoever on a dark night and particularly a rainy night, there is nothing gradual about it. From the facts we believe the defendant had his car under the same control as any ordinary prudent driver under the same circumstances and facts.
Plaintiff next charges defendant with negligently failing to see plaintiff and his automobile. Of course, it was practically impossible to see the plaintiff for he was either on the front seat of the car behind the wheel or down on the back seat awaiting the collision. Plaintiff testified to that fact himself. He was asked, "You left the back end on the Highway?" A. "Yes, that's right." Q. "Then what happened?" A. "I just sat there holding onto the steering wheel and waiting for the accident." Q. "And after that, Mr. Louque ran into you?" A. "That's right." In addition, the automobile of the plaintiff was painted, as described by him, a "cool green" which added nothing to its visibility. There is an additional reason why the defendant's visibility was obscured on this night and that was because of the approaching Downs' automobile from the opposite direction. As described by Downs the parked automobile never came between the two lights, that is, never showed up as an obstruction between his lights and those of the defendant. Furthermore, Downs arrived opposite the parked automobile at exactly the same time that the defendant struck it, which of itself made it practically impossible for defendant to see this unlighted parked automobile. Downs stated that it was impossible to see the parked automobile and he only sensed an obstacle on the highway, when he was within 150 feet of it. He was in a better position to see the obstacle than the defendant as the parked vehicle was in the defendant's lane and might break the light of the defendant's car to Downs, the approaching driver. However, even sensing it, he did not know what it was until he got right up on it and then he was most apprehensive that he would be involved in the wreck because he realized he was too close to do anything but pass.
Lastly, the plaintiff charges the defendant with negligence in failing to be able to stop his automobile within the range of his headlights. It would appear that the simple answer to this is that no one can *799 stop an automobile within the range of his headlights when apparently there is no reason to do so. In other words, it was impossible to see this parked automobile until it was too close to avoid striking it. In addition, it would be a denial of justice to hold a motorist liable under the facts of this case merely on the ground that he was not able to stop his automobile within the range of his headlights. Whether the defendant was able or not to do that of which the plaintiff complains, was not a proximate cause of this accident. While on this particular question we would like to call attention to an article in the Louisiana Law Review, Vol. 17, February 1957, on Page 346 by the eminent authority, Professor Wex S. Malone, Professor of law at Louisiana State University, in which he stated:
"Contributory negligence. The constant increase in negligence cases arising from the operation of automobiles has induced courts in the past to reach out for easy rules of thumb which they have hoped would make it possible to dispose of these controversies with a minimum of effort. Thus, there came into being arbitrary pronouncements such as the Stop, Look and Listen Rule devised by Justice Holmes in Baltimore and Ohio Railway v. Goodman, and the Assured Clear Distance rule which still probably prevails in a narrow majority of states. The Stop, Look and Listen Rule never met with a warm reception in the state courts, and it was finally overruled by the United States Supreme Court itself. But the Assured Clear Distance Rule is still paid lip service, although it is being rapidly eroded by the creation of numerous exceptions which threaten eventually to reduce it to utter impotency.
"The reasons for an aversion to these doctrines are not difficult to find. First, they are the pronouncements of propositions that are inconsistent with common observation and common sense. Motorists simply do not stop, look and listen at each and every crossing. And if their failure in this respect are to deprive them arbitrarily of a right of recovery without reference to the circumstances otherwise, the result would be to grant a wholesale immunity to railroads for the injuries and deaths they cause at crossings through their neglect of duty. Similarly, motorists do not drive at night with such meticulous care that they can bring their vehicles to a complete stop within the range of vision afforded by their headlights. The elimination of accidents at night can be better accomplished by stepping with a firm foot on those who obstruct the public highways either by casting objects upon the roads or by allowing their vehicles to remain stationary without affording adequate warning of the danger. The second reason for the decline of arbitrary rules of this kind is that they usually have the effect of giving increased life to the unpopular doctrine of contributory negligence. They do not create liability. They serve more often to extinguish it, and usually the worse offender becomes the beneficiary.
"Although our courts in Louisiana have not yet seen fit to measure the obligation of the night driver by the standard of ordinary care under the circumstances and they still adhere in form at least to the Assured Clear Distance Rule, yet they have riddled the rule with so many exceptions that it serves little more purpose in the law than the appendix does in the human body. The courts discuss it solemnly in their opinions while they ignore it in practice. Hasn't the time come to throw the rule out of our jurisprudence and to judge each case on its merits through the reasonable care formula? Other courts have done so. Our latest case recognizing an exception to the Assured Clear Distance Rule is Vowell *800 v. Manufacturers Casualty Insurance Co. [229 La. 798, 86 So.2d 909]. Defendant's truck obstructed the highway by remaining stationary for about five minutes on the travelled portion without rear lights. Plaintiff approached from the rear at which the court regarded as a reasonable speed with his headlights dimmed for the benefit of oncoming traffic, and he rammed the rear of the obstructing truck. As usual, it was the plaintiff, not the truck, that suffered the most severe injury. The court found that the Assured Clear Distance Rule does not apply to `unexpected and unusual obstructions' that the plaintiff had no reason to anticipate. If the obstruction had been `expected' or `usual' there would be no difficulty in finding that the plaintiff was guilty of ordinary contributory negligence in failing to reduce his speed and to bring his car under control accordingly. Hence we find that the Assured Clear Distance Rule is not needed in the cases where it would be applicable, and, conversely, it is not applicable in the cases where it would differ from the ordinary rules of negligence."
Without further ado we consider this case under its facts to come squarely under the exception to the general rule as laid down in Gaiennie v. Cooperative Produce Co., 196 La. 417, 199 So. 377; Dodge v. Bituminous Casualty Corporation, 214 La. 1031, 39 So.2d 720; Vowell v. Manufacturers Casualty Insurance Co., 229 La. 798, 86 So.2d 909, 913, and scores of others which could be cited if necessary.
The cases cited and relied upon by the plaintiff are not apposite under the facts of this case and it is not necessary that this opinion be further prolonged by a discussion differentiating each of the cited cases. The Vowell case, supra, decided by our Supreme Court is particularly applicable to the case at bar. Therein Justice Simon as the organ of the court stated:
"An examination of the evidence in its entirety convinces us that the trial court was correct in its conclusion that the driver of the lumber truck was negligent in stopping on the highway, completely blocking a lane of traffic, with inadequate or no visible signals warning approaching traffic of its presence, and that such negligence was the sole and proximate cause of the accident. The evidence clearly preponderates to support plaintiff's contention that the lumber truck was without lights or other signals and therefore not observable until too late to avoid the accident.
"Graham was traveling at a speed well within the legal limits and was exercising such due care and caution as was warranted by the then prevailing conditions of time and weather. The plainly revealed position of the white panel milk truck and the lights of the approaching eastbound traffic were caution enough to him that he was bound to remain in his own lane of traffic. There was nothing whatever to cause him to anticipate any hazard on the open highway in the vicinity of the milk truck such as this unlighted, parked lumber truck. When he first saw the parked timber truck he did all he could do to avoid the accident. He immediately applied his brakes. Had he swerved to the left of the timber truck he would have collided with approaching eastbound traffic. Had he swerved to the right of the timber truck he would have collided into the rear of the white panel milk truck. Faced with this emergency created by the timber truck, he did all that could have been done under the circumstances in an effort to avoid the accident.
"Our rule that a motorist traveling on the public highways after dark or during a rainstorm, fog, or other abnormal condition, which prevents him seeing ahead, except imperfectly, and *801 for a short time and distance, must guard against striking objects in the road with which he may be suddenly confronted, constitutes an exception to the general rule that a motorist may assume that the road is safe for travel even at night. But that exception to the general rule is itself subject to the exception that a motorist traveling by night is not charged with the duty of guarding against striking an unexpected or unusual obstruction, which he had no reason to anticipate he would encounter on the highway. Jacobs v. Jacobs, 141 La. 272, 74 So. 992, L.R.A. 1917F, 253; Kirk v. United Gas Public Service Co., 185 La. 580, 170 So. 1."
For the above and foregoing reasons the judgment of the district court is hereby affirmed.
NOTES
[1] In one place the plaintiff testified the car was 12 years old; in a statement to an insurance company that it was a 1941 Dodge.